## AMERICAN SULPHITE PULP CO. v. DE GRASSE PAPER CO.

(Circuit Court of Appeals, Second Circuit.   January 29, 1912.)

### No. 135.

PATENTS (§ 319*)—INFRINGEMENT—DAMAGES—LICENSE FEE.

Where complainant established the validity of a patent and defendant's infringement, but was unable to prove a uniform rate of license fee, or a uniform rate for the particular period during which defendant's infringement began, due largely to the different holdings, some in favor of and some against the validity of the patent, it was nevertheless entitled to recover damages based on the lowest rate of license fee charged and collected down to the time infringement began.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 577–586; Dec. Dig. § 319.*]

Appeal from the Circuit Court of the United States for the Northern District of New York.

Action by the American Sulphite Pulp Company against the De Grasse Paper Company for infringement of patent. From a decree of the Circuit Court (190 Fed. 39) awarding complainant nominal damages only, it appeals. Reversed and remanded.

See, also, 157 Fed. 660, 87 C. C. A. 260.

This cause comes here upon appeal from a decree of the Circuit Court, Northern District of New York, confirming the report of a master finding complainant entitled to nominal damages only upon an accounting for profits and damages against a defendant who had infringed the complainant's patent.

The action was brought by the usual bill in equity praying for injunction and accounting under reissued letters patent No. 11,282 dated November 15, 1892, to George F. Russell, assignor to complainant, for improvements in pulp digesters. The particular improvement consists of a cementitious lining for the digester in which the wood pulp is treated, or, as the Circuit Court of Appeals in the First Circuit expresses it, "homogeneous structural linings, composed of adhesive and resisting materials in the nature of cement, which possess the required qualities described in the specifications." The "required qualities" are such as will resist the influence of acids and of sulphurous gases acting upon the lining under great heat and pressure.

The patent has been several times before the courts; it is sufficient to refer to our former opinion in the case at bar, 157 Fed. 660, 87 C. C. A. 260, in which we followed the First Circuit holding the patent to be valid and also held that defendant's structures infringed the claims. Upon receipt of the mandate of this court, the Circuit Court entered the usual decree, sending the cause to a master to take proof as to profits and damages. The only question before us on this second appeal is whether or not the master and the Circuit Court erred in holding that no profits had been shown and that upon the evidence complainant was entitled to nominal damages only.

F. T. Benner, Howard P. Denison, and A. P. Browne, for appellant. Henry Schreiter and W. B. Van Allen, for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). Upon the accounting complainant began by introducing some testimony apparently directed to showing profits by defendant; but it soon abandoned that line of proof, and concedes here that no profits were

shown. The only question is as to damages, and the only damages sought to be proved are such as might result from deprivation of license fees which complainant could have obtained for defendant's digesters, if the latter had admitted the validity of the patent and obtained complainant's consent to lining them with its material, instead of proceeding to line them without consent and in infringement of the patent.

The master found that complainant had "failed to prove an established license fee at the time defendant commenced to infringe"—in 1903. That finding is correct and fully warranted by the testimony.

He found as a conclusion of law that complainant was entitled only to nominal damages. This conclusion was reached upon the theory that unless a uniform rate of license fee, or at least a uniform rate for the particular period during which defendant's infringement began, can be shown, nothing at all can be recovered. We do not agree in this conclusion. The patent had a career of vicissitudes. Sometimes it was held valid, sometimes void. In consequence the owner could not always get the same license fee. There was quite a variance between the fees paid in tribute to the patent. Nevertheless the owner was constantly seeking to derive profit from the patent by selling licenses under it. These licenses were not yearly ones. They ran each for the full unexpired term of the patent. The size of the digesters and other circumstances made this the most satisfactory sort of license. The owner uniformly insisted on getting some license fee, and uniformly succeeded in getting one, except in the case of infringers like defendant whom it prosecuted. Licenses for the lining of over 200 digesters were sold. In the case of two of these licensees there were peculiar circumstances which indicate that the rates they paid should not be considered as a basis for fixing a rate to others. They will be referred to later. At first the amount of fees was fixed upon what is called the tonnage basis, but later, and before defendant's infringement began, they were calculated upon the cubic foot. Leaving the two licensees above referred to out of consideration, the lowest rate of license fee charged and collected down to the time when infringement began seems to have been 86 cents per cubic foot. Upon such a state of facts we are of the opinion that an infringer should be held to have damaged the owner to the extent of what such infringer would have had to pay for a license at the lowest rate for which licenses had been issued, had he not infringed but conceded the validity of the patent at the outset. An 'owner may not announce some fixed rate, and then constantly depart from it for one reason or another, and at the same time insist that an infringer shall pay this rate, which the owner finds it impossible to collect from all others who use his improvement. It would be reasonable to assume that, had the infringer put the owner to an election either to abate from his announced rate or to undertake an infringement suit, such owner would have been willing to accept a rate as low as he had already accepted from others who possibly had put him to a like election in their cases. But it is a very different

thing to hold that where there is a lowest limit below which the owner has never gone, preferring to bring suit rather than accept so little, an infringer may appropriate the invention feeling assured that, because all licensees have not paid at exactly the same rate, he will never have to pay anything. Such a rule seems to us to be most inequitable, and the one indicated above is certainly fair to both sides.

The precise question has apparently not been presented to the courts, but we do not find in the decisions of the Supreme Court which have been referred to on the briefs anything which would preclude the adoption of the rule above suggested.

In Seymour v. McCormick, 57 U. S. 480, 14 L. Ed. 1024, the court says:

"If any person could use the invention or discovery by paying what a jury might suppose to be the fair value of a license, it is plain that competition would destroy the whole value of the monopoly."

Using as an illustration a patented turnout in a railroad, the court says:

"It was the interest of the patentee that all railroads should use his invention, provided they paid him the price of his license. The only actual damage which the patentee has suffered in such a case (infringement) is the nonpayment of the price which he has put on his license. There may be cases, as where the thing has been used for but a short time where the jury should find less than that sum; and there may be cases where from some peculiar circumstance the patentee may show actual damage to a larger amount. Where an inventor finds it profitable to exercise his monopoly by selling licenses to make or use his improvement, he has himself fixed the average of his actual damage, when his invention has been used without his license."

In Packet Company v. Sickles, 86 U. S. 611, 22 L. Ed. 203, evidence was given by defendants that the plaintiffs had sold a great many licenses for the use of the patent on steamboats, that the patent fees were numerous and ranged from $250 to $1,500 for the use of the patent during its existence, and that, although they had produced evidence of all the sales made of licenses for the use of the patent on steamboats during its existence, the fee in no case exceeded the latter sum. Notwithstanding this testimony, which seems to have been uncontradicted, the verdict and judgment was for $11,333, with interest from the commencement of the suit. The court said:

"The defendants in various form prayed the court to instruct the jury that the measure of damages was the established rate for the license to use the invention, as ascertained by the sales made by plaintiffs of such license to others. If this was the true rule of estimating the damage, the bill of exceptions shows that a sufficient number of such licenses and the prices at which they were granted were in evidence to enable the jury to apply the principle to the case before them. And we are of the opinion that this was the sound rule. In such case nothing can be more reasonable than that the price fixed by the patentee for the use of his invention, in his dealings with others, and submitted to by them before using it, should govern."

· In Rude v. Westcott, 130 U. S. 152, 9 Sup. Ct. 463, 32 L. Ed. 888, where the court held that enough was not shown to establish a rate of license which could be used as a measure of damages, there were "two instances, and perhaps a third instance, in which a specified sum had been paid for the use of the machines or for the privilege of mak-

ing and selling them." There was nothing to show that license fees had been paid by such a number of persons as to indicate a general acquiescence in their reasonableness.

There is nothing in the other cases cited to call for special notice, and we find nothing in the frequent statement than an "established rate" cannot be proved except by showing uniformity, to preclude the adoption of the rule above indicated, which to us seems reasonable and equitable.

As to the rates paid for license fees the record is as follows: The master reported a schedule of the so-called "straight" licenses, testified to by complainant's witness, its president, George W. Russell, from the books, to have been granted by complainant, based upon the cubical contents of the digesters, issued prior to the date the infringement by defendant began. There are eight of them, the rate varying from 86 cents to $1.35 per cubic foot. Besides these, there was proved in the same way by the same witness, called as defendant's witness, 72 licenses (including the eight). The first 8 of these 72 granted years before defendant's infringement were "for services rendered," and need not be considered. The tabulation printed in the record which contains these 72 does not state as does the tabulation of the 8 what was the unit of charge in each case, and we cannot make the calculations ourselves. Defendant's counsel called attention to some of them, giving the calculations, and stating that in several instances the rate was less than 86 cents per cubic foot. It may probably be assumed that, if there were others less than 86 cents, he would have referred to them also, so it will be sufficient to examine those to which he so referred.

A group including Nos. 33 to 43, inclusive, shows a rate in some instances as low as 19 cents, in other instances 15 cents. It appears, however, that all the licenses in this group were owned or controlled by the International Paper Company. The brother of the president of complainant company, William A. Russell, in his lifetime controlled that company, and was also the chief person concerned in organizing the International Paper Company. He had promised on behalf of the pulp company, before the paper company was formed not to bring suit against it for infringements of this patent. After William A. Russell's death in 1899, the International Paper Company claimed that the right to use the Pulp Company's patents should have been transferred to the Paper Company with his other interests in the paper and pulp business. There was a controversy between the two companies which was finally settled by the Paper Company paying a lump sum of $20,000, and taking, among other things, licenses covering all the mills it owned or controlled. Under these circumstances, the rate charged these mills should not be taken as a criterion by which to determine the rate of license fee charged by complainant for the use of its patented improvement.

In the case of No. 56, West Virginia Pulp & Paper Company, the rate figured on ($10,000 for 27,840 cubic feet) is stated to be about 36 cents. According to Russell's statement, a mistake was made when the gross sum of $10,000 was charged for a license; it being supposed

that certain other digesters for which the predecessor of the West Virginia Company had already paid had been discontinued. For that reason the rate of license fee in this case is exceptional and may be disregarded.

Upon the whole record we conclude that 86 cents should be accepted as the lowest unit of charge. If, however, a mathematical calculation from any of the figures in the table will show that some lower unit was charged—disregarding the first eight, the International Paper Company and the West Virginia Company—that rate should be accepted as the unit for calculating the damages.

It is contended by defendant that the master disbelieved Russell, and held that his testimony, being uncorroborated, proved nothing. We do not so read the report. The master does find facts which are testified to only by the witness. But he did not find that there was any uniform rate, saying that had the complainant introduced the testimony of licensees and books of the company the evidence "would have been more convincing to the master."

In the original suit a license to the High Falls Company in 1894 was put in evidence, which included a second patent owned by complainant and called the Jurishina patent. This was some time prior to defendant's infringement. The license to the International Paper Company was put in before the master. It is dated February 4, 1899, and includes the Jurishina patent "and also any other patent or patents relating to the lining digesters with cement tile or bricks that it may (thereafter) acquire." It was granted, as we have seen, upon compromise of the claim that the International Company had succeeded to all William A. Russell's interests. From these two isolated instances apparently the Circuit Court inferred that the licenses granted by complainant "in nearly every instance, if not in all instances covered and granted the right to use the processes and products described in both patents." We think the inference is not warranted by the facts in proof. There is nothing in the testimony to show that the licenses generally included both patents. The master did not find that they did. He merely held that these two licenses which did include the Jurishina patent could not be taken into consideration towards showing the establishment of a fixed license fee.

We do not find sufficient in the evidence to support the contention of complainant that the damages should be trebled.

The decree is reversed with costs of this appeal and the cause remanded with instructions to find damages in favor of complainant on the basis of 86 cents (or such lower sum as the present record discloses), with interest from the date of commencement of the suit, and all costs of the accounting.