CONSOLIDATED RUBBER TIRE CO. et al. v. DIAMOND RUBBER CO. OF NEW YORK.

(District Court, S. D. NEW YORK.   July 22, 1915.)

1. PATENTS ☞318—DAMAGES FOR INFRINGEMENT — ASCERTAINMENT OF REASONABLE ROYALTY.
Where the owner of a patent manufactured and sold an essential component part of the patented article, the selling price above the cost of production including both the manufacturer's profit and the royalty under the patent, so that no fixed royalty was established, a reasonable royal-

ty may be fixed for the purpose of an accounting by an infringer, by allowing out of such gross profit a liberal part as profits and a conservative part as royalty.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. ☞318.]

2. PATENTS ☞318—DAMAGES FOR INFRINGEMENT—ROYALTIES.

In fixing such a reasonable royalty, the period will not be considered during which the patent was freely infringed because of its supposed invalidity.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. ☞318.]

3. PATENTS ☞312—ACCOUNTING FOR INFRINGEMENT—BURDEN OF PROOF.

A defendant who made and sold to manufacturers an article expressly fitted and obviously intended for use as a component part of an infringing article, on an accounting for contributory infringement, has the burden of showing that it was not so used.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 544–549; Dec. Dig. ☞312.]

4. PATENTS ☞316—SUIT FOR INFRINGEMENT—SCOPE OF ACCOUNTING.

While a lower court may not in any wise change a decree after it has been affirmed, it is to be construed in accordance with equitable principles, and under a decree for infringement of a patent for a completed article complainant may have an accounting for component parts made and sold by defendant to other manufacturers, and by them used in making the infringing article.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 562; Dec. Dig. ☞316.]

5. PATENTS ☞319—DAMAGES FOR INFRINGEMENT—INTEREST.

The allowance of interest on an award of damages for infringement, based on a reasonable royalty fixed by the court, rests in the court's discretion.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 577–586; Dec. Dig. ☞319.]

6. PATENTS ☞319—INFRINGEMENT—ALLOWANCE OF PUNITIVE DAMAGES.

Infringement of a patent during a number of years, when its validity was doubtful by reason of conflicting decisions in different circuits, cannot be said to be wanton, in such sense as to warrant the imposition of punitive damages; but its continued and persistent infringement, through attempted evasions, after its validity had been finally established by the decision of the Supreme Court, justifies the allowance of such damages thereafter.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 577–586; Dec. Dig. ☞319.]

In Equity. Suit by the Consolidated Rubber Tire Company and the Rubber Tire Wheel Company against the Diamond Rubber Company of New York. On exceptions to master's report. Report modified, and decree for complainants.

See, also, 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527.

This is a hearing upon exceptions to a master's report upon an accounting in a suit in equity for patent infringement. The plaintiffs abandoned any effort to prove profits, and rested their case upon their damages, which the master has found to be at the rate of 5 cents per pound of a special kind of rubber stock, a necessary element of the combination patented to Grant, No. 554,675, February 18, 1896, for

rubber tires.  Both sides excepted to the report, and the plaintiff moves for treble damages.  The report is so voluminous that no statement of facts need be added.

George W. Wickersham and Charles W. Stapleton, both of New York City, for plaintiffs.

Charles Neave, of New York City, and C. K. Offield, of Chicago, Ill., for defendant.

LEARNED HAND, District Judge.  The first question is of the established or reasonable royalty; the second, of treble damages. The first question breaks into three parts:  The amount, if any, of the proper royalty;  the scope of the accounting, whether for whole tires or the rubber stock alone;  the Kokomo transaction.  I shall take these up in order, and conclude with the question of treble damages.

The first question, therefore, is of the amount of an established, or of a reasonable, royalty.  I do not see how any one can dispute that there is adequate proof of an established royalty of 10 or 20 cents up to 1899.  In 1899 the plaintiffs began themselves to manufacture the component parts, and they abandoned a license agreement, charging instead a flat rate for the rubber stock, which varied only with the cost of crude rubber, a practice they continued down to May, 1902, when the Circuit Court of Appeals of the Sixth Circuit declared the patent void.  In these contracts it was, nevertheless, specifically agreed that the flat price should include the rent of a brazing or welding machine and the royalty for the patent in suit, together with a design patent.  The "rent and royalty" so fixed was originally 20 cents like the immediately preceding licenses, but competition cut this down first to 10 cents and subsequently to 5 cents.

The defendant's theory is that this figure cannot be regarded as wholly royalty, since both sides did not so understand it, since the plaintiffs sold freely in the market to others at the same prices, and since the flat price necessarily included the profits of the business, which on the average are estimated at 6.24 cents per pound from 1903 to 1908, during which time the patent had little or no protection.  The licenses distinctly provide that the sum shall be "rent and royalty," of which the rent is a trifling matter, and I think the parties must be said to have so understood it;  but I do not think that the matter is necessarily settled by what the parties called it.  As to the second objection, it seems to me of no consequence that the plaintiffs sold to outsiders, except in so far as it shows that the royalty, so called, included the plaintiff's profits, and was not all royalty.

This brings up the third point.  I agree that a license gives only the right to practice the invention, and that its value, and hence the reasonable royalty for it, must leave room for the usual profit in the business, together with the cost of production.  Whether the resulting price will be greater than what the market will bear only experience can test, which means that what the market will bear determines the license value or royalty.  Even though the parties agree to call a sum a royalty, it should not be taken as such if it include the manufacturers' profits in cases where, as here, he does not give the mere right, but makes the

article and sells it. In the sum fixed by these licenses are therefore included two elements which the mere words of the agreement could not in fact fuse into one. Therefore I do not hold that the whole 20 cents of the license agreements up to May, 1902, was an established royalty; but I do hold that, while the patent was correctly supposed to be good, the sum of the manufacturing profits and of the royalty and of the rent was abundantly shown to be 20 cents, which is as much as to say that the market would stand a "loading" of the manufacturing cost by that sum for those combined elements.

In this posture of affairs came the decision invalidating the patent on May 6, 1902, making impossible any true established royalty thereafter. All the subsequent period until the patent was finally declared valid in April, 1911, seems to me irrelevant to any just estimate of the patentee's damages. Even if, crippled as the patent was by the adverse ruling, an apparent established royalty during that period had been shown, I should not regard it as a true established royalty, because that phrase should not be used of the value of a patent monopoly which is suspected with good reason of being no patent at all. What we seek is the sum above cost and profits which the patentee could exact of the market through his monopoly. The sum he exacted while he was unable to enforce it, and while every one supposed he had no monopoly at all, or at least suspected he might not have any, is surely no index of the actual value of his right. Hence I think that during the period there was no established royalty for the right, and that we must seek a reasonable royalty, to which I now turn. Although the evidence of the mingled elements of profit and royalty and rent substantially ceased in 1902, and although the infringement did not begin till 1905, yet, had the patent continuously enjoyed the recognition to which it is now conceded to be entitled, it would in 1905 have been possible to charge and to get the same sum for the same elements, and to continue to get it till the patent expired.

To begin with, the plaintiffs swear they continued to charge the sum of 20 cents till they were forced to a reduction first to 10 and in some cases to 5 cents by the competition of infringers. Again, we have the right to assume that a royalty established as this was over a period of years would continue, unless some change is shown in the market conditions. The only change shown is the presence of infringers, who wrongfully cut under the prices established by the patentee. It is an inference that the plaintiff could have continued its profits of 20 cents, and that the market would have borne it, had it not been for this new factor, which arose after 1902. I shall proceed upon the assumption, therefore, that the joint sum of rent, reasonable profit, and reasonable royalty have been proved to amount to the sum of 20 cents, the amount amply proved to be obtainable up to May, 1902.

[1] It is, however, necessary to find some means of disentangling from this joint sum the amount of the reasonable royalty. This can be done only in case the record contains adequate evidence. We have the average cost of manufacture of the Buckeye Company over a period from 1901 to 1912, and it amounted to less than 42 cents. The Buckeye Company being a mere subsidiary of the plaintiffs, we may

disregard its existence. To this must be added the selling cost, which we have only for the years 1903 to 1908, though Delapierre says that the changes from 1908 to 1912 were not important. Taking the selling cost for those six years, we find it is 11.4 cents, and the Buckeye cost 40.8 cents. The sales averaged 58.4 cents, leaving a profit of 6.2 cents. Thus we may say that in a time of open competition the plaintiffs made great quantities of rubber at a profit of less than 12 per cent. Now the master, in allowing 5 cents, has given an allowance of 23 per cent. upon the cost, 65 cents, or nearly double what the plaintiffs have shown they were willing to manufacture at. The price at which the plaintiffs were to manufacture was to fall, it is true, but only with the cost of crude Para, and the difference would not change. I am quite aware that in these matters we are not able to tell with accuracy what the reasonable profits or reasonable royalty would be; but we can meet that difficulty by taking only most conservative estimates. This is becoming the tendency of the courts in all the best considered of the later opinions. American Sulphite Co. v. De Grasse, 193 Fed. 653, 113 C. C. A. 521; U. S. Frumentum Co. v. Lauhoff, 216 Fed. 610, 132 C. C. A. 614; Bemis Car Co. v. J. G. Brill Co., 200 Fed. 749, 119 C. C. A. 229. I read Dowagiac Mfg. Co. v. Minn. Moline Plow Co., 235 U. S. 641, 35 Sup. Ct. 221, 59 L. Ed. 398, as settling the mooted question as to whether a reasonable royalty may be allowed, and as laying down a more liberal rule, to be applied with caution.

[2] Any other conclusion in the case at bar would be most abhorrent to justice. I agree, as I have said, that the 5 cents to which the plaintiffs were at times driven was not a true royalty, and that, if that period is to be taken as indicative of the real value of licenses, no damages are shown. I accept the defendants' argument pro tanto, and with it falls the reasoning of the master and the plaintiffs; but it does not seem to me that the result should fail. It is a manifest absurdity, in view of the history of the market up to 1902, to say that a license under this patent had no value, and it cannot be that only through the persistent attacks upon their rights the plaintiffs in the end are to recover nothing. To reach that result the defendants must practically assert that the patent became valueless because of its constant infringement, which is nothing else than for them to make their excuses through their own wrong, along with that of others in like case.

However, it is urged that the licenses to jobbers and manufacturers were no tests of the proper licenses to rubber makers, and in support of this the Firestone Case is instanced. That case was a compromise made of a past license when the patent had only two more years to run, and the license was coupled with an adjusted balance for past infringement of $80,000. It may be dismissed, I think, from consideration as a test. As to the objection that these licenses were all to jobbers and the like, I think it makes no difference. In estimating lost sales it is, of course, necessary to show that the patentee would have made the sales. Not so with licenses. Every wheel made up with Diamond rubber was a wheel upon which the plaintiffs lost a license, whether they would have manufactured it or not. In contributing to that eventual infringement which occurred when the rubber was so

used, they contributed to a tort the damages from which are to be estimated by a loss of the royalties, which could have been got for that wheel. Whether the defendants could have secured better terms is beside the point. What they did was to deprive the plaintiffs of a corresponding amount of royalties on wheels, and the licenses for wheels are established.

The defendants will suggest this difficulty with the foregoing treatment: That it ignores the effect of the three suits which gave immunity to the Goodyear Company, the Kokomo Company, and the Victor Company. This immunity extended to selling the rubber stock, and we may assume that it also extended to selling complete tires. So far as concerns complete tires, they would be immune in the hands of the customers of all three companies; but, so far as concerns the rubber stock, no one who bought could possibly have used it, either to make up tires himself (Rubber Tire Co. v. Goodyear Co., 232 U. S. 413, 34 Sup. Ct. 403, 58 L. Ed. 663), or to sell the component elements to another to make up tires (Woodward Co. v. Hurd, 232 U. S. 428, 34 Sup. Ct. 409, 58 L. Ed. 670), or, in my judgment, to sell the rubber stock alone, with intent that it should go to make up a Grant tire, as I shall show later. This being true, the three companies did not have it in their power to affect what would have been the royalty for the invention during the period in question for the following reasons:

Their effective right to sell only complete tires made impossible to them any effective competition, unless they went into the tire business themselves, making up and selling the invention as a whole. Otherwise, the plaintiffs could have stopped their customers from any practical use of what they had bought, a condition which would at once have stopped their sales. On the other hand, each of these companies was a rubber company, selling this stock to jobbers in tires, to carriage manufacturers and the like, and doing a large outside business. It is the merest speculation to assume that they would have gone into competition with their former customers in the tire business in order to avail themselves of the only rights secured by their decrees. What they needed to compete with the plaintiff was the right to sell rubber stock of proper size and conformation, with or without the channels and wires, and that they really never got by the decrees, though the trade did generally suppose so, until the Supreme Court decided the question. They never did go into the manufacture of complete tires upon a scale large enough to affect the plaintiff's market, and if speculation is proper I see no reason to suppose they ever would have.

All sorts of considerations might have influenced them against such an undertaking; if they competed directly with carriage manufacturers and with jobbers, they might have lost in good will more than they could have possibly made in the sale of tires; the reorganization of their business to include this might have wholly thrown out of gear their methods and their prospects. We must, I think, take this record as it stands, showing them competitors in the sale of rubber stock and in that alone. We may not assume that, had they learned early enough that their customers were all infringers, they would have sold the complete tires. Therefore the plaintiffs were all along the only ones

who might sell rubber stock and channels and wire to any one who could rightfully make them up, and there is no evidence that they had any competition to fear in that business, had their rights been known.

[3] The next question is of the scope of this accounting—whether the defendants are in fact contributory infringers; whether the decree permits that inquiry. The rubber stock was so obviously intended to be used in Grant tires that no argument is possible, and indeed Woodward conceded as much. There are holes for the wires; the sides slope for the slope of the inner sides of the channels. There is nothing, I apprehend, unique about contributory infringement; the question merely is whether the defendant has assisted in some way the eventual violation of the patent. In the case at bar it would always be possible for the defendants to show of a given sale that the stock had not been used for a Grant tire; but when the plaintiffs show such sales of rubber as every one would suppose in natural course must go into Grant tires, the defendants may reasonably be called on to proceed with the proof. Thus in Henry v. A. B. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880, it was held enough that the defendant sold the ink with the expectation that it would be wrongfully used, and this was held to be equivalent to the "purpose and intent" to use it so.

The defendants' only answer is that, although the tires were sold with that expectation and intent, they might have been used either with straight-sided channels or with cement. Their theory is that they were not fitted only for an infringing tire, under the doctrine of Crown Cork & Seal Co. v. Brooklyn Bottle Stopper Co. (C. C.) 172 Fed. 225, and similar cases. This rubber stock was, however, not fitted for any other use. I do not mean to say that it could not have been used in straight channels, though these had substantially disappeared by 1905; but, if they had been so used, it would have been a perversion from its obvious purpose. Having made them for that use, it would be most unfair to ask the plaintiffs to show that they had not been misused. The same thing is true of the possible cementing of the tires into the channels. The holes for wiring are there, and if they were in addition cemented that should be shown. There is undoubtedly proof of a certain amount of cementing, which the plaintiffs insist had been discontinued before 1905. I have not found any very definite evidence upon that question, but I think it immaterial. If an infringer had wired down the rubber in the channels, I do not think that he would be less an infringer if he also cemented it. This is not inconsistent with the fact that the merit of the invention lay in the free tipping feature. The invention itself lay in the claims, and the claims may be infringed, though the merits be lost. There is nothing in the decisions to show that to fasten by wires and cement is not to infringe. The holes in the rubber indicate that the defendant's intention was to have wires used. If any of the rubber was not so used, that should have been shown by the defendants.

[4] As to the form of the decree, while it is of course true that a lower court may not change in any wise a decree after it has been affirmed, and while the actual infringement was of a complete tire, and

the injunction proceeded upon that ground, I do not think that these facts need embarrass an accounting for the sales of rubber stock, merely because of the use of the word "such" in the decree. Equity does not cut so close; it is the general rule that the extent of the infringement may be considered by the master, and the controversy terminated so far as it is possible (Welling v. LaBau [C. C.] 32 Fed. 293; Westinghouse Air Brake Co. v. Christensen Engineering Co. [C. C.] 126 Fed. 764; Brown v. Drohen [C. C.] 171 Fed. 438), even though it involve the consideration of new devices. The alternative is a new suit, which equity does not encourage. To interpret this decree so verbally would work a most gratuitous injustice. The plaintiffs knew that the defendants were in the main rubber makers; to suppose that any one meant to confine the case to the few completed wheels is absurd.

The final question concerns the Kokomo contract, and the defendants' device to avoid infringement after the Supreme Court had finally declared the patent valid. Judge Day has already passed upon this, and his opinon leaves nothing more to say. It has been decided that, though the Kokomo Company might sell the rubber, it was an invasion of the patent for any customer to sell it with the other parts to another for the purpose of making up a tire. Woodward Co. v. Hurd, 232 U. S. 428, 34 Sup. Ct. 409, 58 L. Ed. 670. If it was an infringement for the Woodward Company to sell the rubber and channels and wires, it must be an infringement for the defendant to sell to the Woodward Company with that intent, unless the whole basis of contributory infringement is different from what I have stated.

The effect of the clause introduced into the decree in this suit is not touched upon in any of the opinions in 232 U. S. 428, 34 Sup. Ct. 409, 58 L. Ed. 670, because the defendants were not parties; but in the appeal reported in 220 U. S. 428, 445, 31 Sup. Ct. 444, 55 L. Ed. 527, the Supreme Court concurred with the remarks of Judge Coxe and these clearly show that the Circuit Court of Appeals for the Second Circuit had no intention of construing that language as a decision upon this question. They simply meant to leave the defendants in the same position respecting rubber bought of the Kokomo Company and the other licensed infringers as though the decree had not passed; the question being left open for future consideration. Now the time has come to consider the question, which turns out to be controlled by Woodward v. Hurd, supra. I therefore overrule the defendants' exceptions.

As to the defendants' first exception to the report, I shall overrule it. The theory that their profits should be taken as a reasonable royalty certainly has no basis in fact or in law. There is undoubtedly a good deal to be said for the position that a reasonable royalty could be figured at a higher figure than 5 cents, as I have tried to show; but no one in the case seems to have considered it from that point of view. The only reasonable royalty actually fixed was 5 cents, and it would be rather absurd to fix such a royalty at the sum of 6.24 cents; the very idea being something of an approximation. Moreover, there is a more substantial reason for caution, which arises from the in-

evitable uncertainty of the computation. We must take such a rate of profit as by no means will be too little, because in such cases the law favors the defendant. A profit of 20 per cent. is not unusual in manufacturing; it would leave a royalty of 6 cents. However, there were the brazing or welding machines and the design patent, which, though trivial, cannot perhaps be thrown altogether out of consideration. There is not enough certainty about the whole matter to overthrow the master's finding.

[5] The exception to the failure to allow interest comes next. It is no doubt true that interest is allowed upon damages for established royalties upon the theory that they are liquidated, and that interest is allowable only on liquidated damages. Creamer v. Bowers (C. C.) 35 Fed. 207; Locomotive Safety Truck Co. v. Pa. R. R. (C. C.) 2 Fed. 682. Moreover, I have treated this as a case, not of established, but of reasonable, royalty, and the damages as unliquidated. It would follow that no interest should be allowed on such damages at least at law. However, the rule is more liberal in suits in equity in which at times interest may be allowed upon unliquidated damages. Mowry v. Whitney, 14 Wall. 620, 663, 20 L. Ed. 860; Pa. Steel Co. v. N. Y. City Ry. Co., 198 Fed. 778, 117 C. C. A. 560. The matter may be said to rest in discretion depending in some measure, according to Mowry v. Whitney, supra, upon the deliberateness of the infringement. In accordance with this intimation in Mowry v. Whitney, supra, I shall allow interest after the date of the decision of the Supreme Court in the case at bar. In justice I have never been able to see why the certainty of the damages should make a difference, except on the theory that a defendant always had the option to commit the wrong if he paid the damages. A corollary to that theory would be that it was unfair to charge the defendant till he had the chance to learn what he might pay. The theory is certainly not sound; there is no reason why a wrongdoer should escape part of the loss he causes.

[6] The final question is of punitive damages. That the infringement was deliberate and continuous, as the master found, is certainly true, if by deliberate one means that the defendants knew their sales infringed. "Wanton" is somewhat a word of rhetoric. I do not know just what the decisions mean when they use it; but the facts are as follows: In 1902, the Circuit Court of Appeals for the Sixth Circuit, composed of three judges of whom two afterwards became Justices of the Supreme Court, after a long and mature consideration, unanimously decided that the patent was void. It was neither a provisional nor a hasty decision, and it can only be the ardor of partisanship which suggests that it was not entitled to the greatest respect. Moreover, the Supreme Court had refused certiorari upon it, and the decision appeared final, at least in the circuit. The ruling was repeated in 1903, and stood as the law of the patent until the Firestone Case in 1907, a decision followed in the Seventh circuit in the same year. Therefore, disregarding decisions of single judges, which are of inferior authority, certainly it was a matter of much doubt after the spring of 1907 whether the patent was void or valid, though of course every infringer knew—as, for that matter, he always knows—that he

took his chance of the eventual outcome. That he was bound to accept the decisions of the Second and Seventh Circuits against that of the Sixth, and concede the validity of the patent, does not appear clear to me. Every one having any familiarity with the patent law knows that the test of invention, however it may be formally couched in general propositions, is in its application of the most plastic and uncertain character. At just what step of novelty the ingenuity of the skilled artisan becomes transmuted into the genius of an inventor, men will always differ, and their differences will be very largely dependent upon personal beliefs too remote for successful statement. If, therefore, by "wanton" it is meant to say that the defendants knew that the patent was valid, I cannot agree with the master; but I find that the validity of the patent remained open to honest question until the Supreme Court definitely settled it in April, 1911. During that period I shall add nothing for punitive damages.

After April, 1911, there is certainly much less to say in excuse for the continued infringement. Had the decisions in Seim v. Hurd, supra, and Woodward Co. v. Hurd, supra, been then made there could have been no excuse, or shadow of excuse, for continuing the business. The provision for treble damages would mean nothing, if it did not apply to such a case. But the case of Kessler v. Eldred, 206 U. S. 285, 27 Sup. Ct. 611, 51 L. Ed. 1065, had not then been overruled or limited, and the scope of that case in my judgment put the matter in doubt. Kessler v. Eldred, supra, held that, if Kessler was protected in selling the lighters, his customers were also protected. All that the Kokomo Company needed was the same immunity for its customers in selling a constituent part of the combination. If the customers had such a right when the seller sold the whole invention, it was certainly not clear that the customers, had not the right to resell to others a single constituent element, just as it was, which the seller had the right to sell to them. Indeed, the defendants still argue on this very accounting that the Supreme Court did not mean to include the resale of a single constituent element. Therefore, had the defendants merely bought from the Kokomo Company after the decision of the Supreme Court, I should not have thought that they were doing what they necessarily knew they had no right to do. I could not say that their infringement had in their own minds no color of excuse.

In fact, they did not do this. The Kokomo Company was not then making any rubber stock, and what it sold the defendants under the contract of 1911 was made out of rubber compound furnished by the defendants, through the use of the old molds, with which up to that time the defendants had made the infringing tires. While it was not quite the equivalent of buying a license from the Kokomo Company, since the latter did actually mold the rubber, a process which cost them about 2 cents of the 5 they received, it missed being a license only by that margin. Certainly, if the defendants had attempted merely to buy a license of the Kokomo Company, it would be too much to ask that such an attempt be taken in good faith. What they actually did was no doubt a middle ground between buying from the Kokomo Company in the honest belief that they could resell and taking a mere·

license, which they must have known was not within their rights. The plan they adopted, they of course hoped might prove effective to protect them, under Kessler v. Eldred, supra, or they would not have adopted it, 'and if that hope be enough their damages should not be increased. However, it is not necessary that an infringer should absolutely know that he has no rights. Russell v. Place, 9 Blatchf. 173, Fed. Cas. No. 12,161. The effort was certainly an evasion, and every sensible man must have seen that it was not within the real meaning of Kessler v. Eldred, supra, whether or not it could eventually be defended. That case was intended to protect the successful infringer, or, as I may call him, the licensed infringer, in the results of his decree. It was to protect his customers because only so could he get the fruits of his own decree of immunity. It must have been apparent that to stir up and stimulate such an infringer to go through the form of manufacture was certainly not within the purpose of such a decision, whether or not the purpose would prove a relevant consideration in the result. Such efforts should be made exceptionally dangerous, and fall within the provision for increased damages.

Furthermore, the defendant's whole conduct has shown that it sought by every device to infringe this patent with impunity. The organization of the Diamond Company of New York, its dissolution at the very expiration of the patent, the assuring that it should by no change have any profits to reach, the efforts to resist the disclosure of the Ohio Company's books, the deviousness throughout of its persistent effort to suck the value from the invention and not pay the price, all these do not help its cause. I shall therefore increase so much of the award as is earned after the decision of the Supreme Court, not by trebling it, as I might do, but by adding the sum of $50,000, which should be enough to pay the costs of the litigation and give the plaintiffs smart money, in addition to the actual award as damages.

Let a decree pass for poundage at 5 cents per pound, with interest, as stated, together with $50,000, and costs.