## FAULKNER v. GIBBS.
### No. 13120.

United States Court of Appeals
Ninth Circuit.

Oct. 30, 1952.

---

636

Fulwider & Mattingly, Robert W. Fulwider, Los Angeles, Cal., for appellant.

Huebner, Beehler, Worrel & Herzig, Herbert A. Huebner and Albert M. Herzig, Los Angeles, Cal., for appellee.

Before STEPHENS, HEALY and BONE, Circuit Judges.

BONE, Circuit Judge.

This action for patent infringement comes to us for the second time. We previously affirmed an interlocutory judgment of the District Court holding appellee's patent valid and infringed and enjoining appellant from further infringement.[1] The Supreme Court granted certiorari and affirmed.[2]

In its interlocutory judgment the District Court referred the cause to a master to ascertain damages. Pending the aforesaid appeals the proceedings before the master were terminated prior to the making of a report and the master was discharged. Upon the remand of the cause from the Supreme Court the question of damages was tried by the District Court on depositions and documentary evidence. The Court awarded damages of $15,000, additional attorneys' fees in the sum of $1000,[3] and costs

1. 9 Cir., 170 F.2d 34.

2. 338 U.S 267, 70 S.Ct. 25, 94 L.Ed. 62, rehearing denied 338 U.S. 896, 70 S.Ct. 236, 94 L.Ed. 551.

3. In its interlocutory judgment the District Court had awarded attorneys' fees of $500. The question of attorneys' fees was not raised by appellant on the first appeal and the award was affirmed by this court without discussion.

to appellee. The awards of attorneys' fees and damages are challenged on this appeal.

Appellee's patent is a game device consisting of a plurality of electrically interconnected game units, arranged in banks, each of which units has the general outward appearance of the well-known pinball machine. Each unit is operated by a separate player who competes with players operating the other units in the multiple assembly.

In Long Beach, California, in July and August of 1944, appellant began operating two 16-unit banks of an infringing game device, which he called "Fawn" games, and he continued this operation until December, 1949.

The District Court's award of $15,000 damages was based upon a finding that $3000 was a reasonable annual royalty to be paid by appellant for this infringing use of appellee's device. The Court found that $3000 was the "prevailing royalty" for use of the patented device at locations which by reason of geographical situation and population could operate at least several months a year; that in addition to this annual royalty appellee derived a net profit of approximately $150 on each unit of game apparatus which he supplied to his licensees. The court further found that a certain license agreement, which shall be called the "Loof agreement", was executed by appellee during the period of appellant's infringement which empowered certain licensees to operate appellee's device at a location in the general neighborhood of the infringing operation of the appellant; that under this license a total sum of $24,500 was paid by the said licensees to the appellee during the term of the license, namely, July 25, 1946, to May 1, 1950; that $10,000 of this amount was diverted to legal expenses in prosecution of the suit brought by appellee against appellant, and that an annual royalty of $3000 was specified in the agreement for the years 1948 and 1949; that both the location named in this agreement and that of appellant's operation permitted operation for 12 months a year; that the income of appellant from the infringing operation was uncertain but that he had a potential gross income from the enterprise of several hundred thousand dollars a year.

Appellant contends that the findings were erroneous in that (1) the court based its estimate of a reasonable royalty on total annual royalties paid by appellee's licensees instead of on the royalty per playing unit for the units licensed in the license agreements; and (2) the court based its estimate of a reasonable royalty on the alleged annual royalty specified in the Loof agreement for the years 1948 and 1949 rather than on the true annual royalty paid for the nine years covered by the agreement.

Appellant argues that the amounts of the royalties specified in the 10 written licensing agreements in evidence were based upon the number of playing units licensed, since in each case the amount of the royalty was dependent upon the prospective receipts of the enterprise, and the receipts in turn were limited by the number of playing units operated. He further contends that the amount of royalty to be charged and the number of playing units to be operated must have been determined at the outset by the same consideration—the estimated future patronage of the business. He attempts to demonstrate this by analysis of the 10 written agreements, from which he concludes that the per-unit royalties charged in the respective agreements were relatively constant for similar locations.

With reference to the Loof agreement, it appears that the licensees thereunder had, for approximately five years prior to the making of the agreement (in February of 1946) been conducting an infringing operation. By the terms of the agreement, $10,000 was payable immediately upon execution thereof as royalties for the years 1946 and 1947. $1500 of this amount was earmarked for expenses of prosecuting the suit against the appellant. An annual royalty of $3000 was fixed for the years 1948 and 1949. The licensees also undertook to pay more than one-half the expenses of prosecuting this infringement suit against appellant, and they subsequently paid approximately $10,-000 toward that end.

Appellant contends that the total amount paid by the licensees under the Loof agreement, less that which was diverted to pay legal expenses, must be apportioned over the entire nine years during which the li-

censees made use of the patented game, including the five years of infringement. This would indicate that the true annual royalty was only $1611. Since appellant's operation was conducted in the same amusement resort as that of the licensees under this agreement, and since appellant operated only one-half as many playing units as the licensees, appellant argues that $806 should be taken as the annual "established royalty" or a "reasonable royalty" to be paid by the appellant to the appellee on account of the former's infringing operation.

■ The statutory provision governing this question is 35 U.S.C.A. § 70, the relevant portion of which is set out in the margin.[4] Save for the omission of any reference to profits as a basis of recovery in infringement cases,[5] this provision makes no change in the long-settled law on the subject. The infringement of a patent is a tortious taking,[6] entitling the injured party to general damages, measured ordinarily by the fair value of what was taken, i. e., the privilege of making, using or selling the patented article.[7] Where an established

royalty for a license is proved, this is the best measure of the value of what was taken by the infringement.[8]

■ In order that a royalty may be accepted as "established" it must have been paid prior to the infringement complained of; it must have been paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have had occasion to use the invention; and it must have been uniform at the places where licenses were issued.[9]

■ Royalties paid under threat of suit or in settlement of claims for past infringement cannot be taken as a standard to measure the value of the patent.[10] "The avoidance of the risk and expense of litigation will always be a potential motive for a settlement."[11]

■ Neither the Loof agreement by itself nor the other nine written license agreements in the record, nor any combination of them, nor any evidence adduced in the depositions, prove an established royalty for the use of the patented game in this

4. " * * * and upon a judgment being rendered in any case for an infringement the complainant shall be entitled to recover general damages which shall be due compensation for making, using, or selling the invention, not less than a reasonable royalty therefor, together with such costs, and interest, as may be fixed by the court. * * * "

5. For a discussion of the effect of the omission from the statute of the word "profits" as a measure of recovery, see Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 179 F.2d 401, 407–8, certiorari denied 339 U.S. 958, 70 S.Ct. 981, 94 L.Ed. 1369.

6. Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 648, 35 S.Ct. 221, 59 L.Ed. 398.

7. Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., supra note 6. Where, however, the patentee has himself engaged in the manufacture, use or sale of his patented article, he may be awarded damages for his loss of profits resulting from the infringement. Singer Manufacturing Co. v. Cramer, 9 Cir., 109 F. 652, 659, reversed on other grounds 192 U.S. 265, 24 S.Ct. 291, 48 L.Ed. 437; Rose v. Hirsh, 3 Cir., 94 F. 177; 3 Walker on Patents 2156–7 (Deller's Ed. 1937).

8. Clark v. Wooster, 119 U.S. 322, 326, 7 S.Ct. 217, 30 L.Ed. 392; Philip v. Nock, 17 Wall. 460, 84 U.S. 460, 462, 21 L.Ed. 679; Rude v. Westcott, 130 U.S. 152, 165, 9 S.Ct. 463, 32 L.Ed. 888; Birdsall v. Coolidge, 93 U.S. 64, 70, 23 L.Ed. 802; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., supra note 6, 235 U.S. at 648, 35 S.Ct. 221, 59 L.Ed. 398; see Hunt Bros. Fruit-Packing Co. v. Cassiday, 9 Cir., 64 F. 585, 587; Dunkley Co. v. Central California Canneries, 9 Cir., 7 F.2d 972, 976, certiorari denied 245 U.S. 668, 38 S.Ct. 134, 62 L.Ed. 539; 3 Walker, supra note 7, at 2157.

9. Rude v. Westcott, supra note 8, 130 U.S. at page 165, 9 S.Ct. 463, 32 L.Ed. 888; see also Dunkley Co. v. Central California Canneries, 9 Cir., 7 F.2d 972, 976, certiorari denied 245 U.S. 668, 38 S.Ct. 134, 62 L.Ed. 539; 3 Walker, supra note 7, at 2158.

10. Rude v. Westcott, supra note 8, 130 U.S. at page 164, 9 S.Ct. 463, 32 L.Ed. 888; see also Dunkley Co. v. Central California Canneries, supra note 9, 7 F.2d at page 976; 3 Walker, supra, at 2161–2.

11. Rude v. Westcott, supra note 8, 130 U.S. at page 164, 9 S.Ct. 463, 32 L.Ed. 888.

case. The annual royalties in the 10 written license agreements, taking the figures from appellant's own analysis thereof, range from $1000 to $3600. The annual per-unit royalties vary from $20.00 to more than $40.00. Four of the agreements recite that the licensees are bound by outstanding injunctions and one of these purports to be a settlement of an accounting proceeding ordered by a court. Of the remaining agreements, five, including the Loof agreement, were made in compromise or settlement of pending infringement suits or claims for past infringement. Only two of the agreements were in effect when the appellant began his infringing operation. This is not a case for application of the established royalty rule for ascertainment of damages.[12]

 Where no established royalty can be proved, it is permissible to show the value of what has been taken by the infringement by proving what would have been a reasonable royalty, considering the nature of the invention, its utility and advantages, and the extent of the use involved.[13] What is a reasonable royalty is a question of fact.[14] A reasonable royalty is an amount which a person, desiring to use a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to use the patented article at a reasonable profit.[15] The primary inquiry, often complicated by secondary ones, is what the parties would have agreed upon, if both were reasonably trying to reach an agreement.[16]

 There is no mathematical formula for the determination of a reasonable royalty.[17] The property loss of a patentee from infringement may arise from such varying facts and circumstances that each case must be controlled by those peculiar to it and except in rare instances the loss can only be determined by reasonable approximation.[18] The court should be conservative in fixing the amount,[19] because of the "inevitable un-

12. See Dunkley Co. v. Central California Canneries, supra note 9, 7 F.2d at page 976; Wallace & Tiernan Co., Inc., v. City of Syracuse, 2 Cir., 45 F.2d 693, 695.

13. Suffolk Co. v. Hayden, 3 Wall. 315, 70 U.S. 315, 320, 18 L.Ed. 76; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., supra note 6, 235 U.S. at page 648, 35 S.Ct. 221, 59 L.Ed. 398; Hunt Bros. Fruit-Packing Co. v. Cassiday, supra note 8, 64 F. at page 587; Dunkley Co. v. Central California Canneries, supra note 9, 7 F.2d at pages 976, 977; Horvath v. McCord Radiator & Mfg. Co., 6 Cir., 100 F.2d 326, 335, certiorari denied Carrier Engineering Corp. v. Horvath, 308 U.S. 581, 60 S.Ct. 101, 84 L.Ed. 486; Austin-Western Road Machinery Co. v. Disc G. & P. Co., 8 Cir., 291 F. 301, 305, certiorari denied 263 U.S. 717, 44 S.Ct. 180, 68 L.Ed. 522; Malleable Iron Range Co. v. Lee, 7 Cir., 263 F. 896, 898, 899, certiorari denied 251 U.S. 562, 40 S.Ct. 342, 64 L.Ed. 415; Consolidated Rubber Tire Co. v. Diamond Rubber Co. of New York, D.C.S.D.N.Y., 226 F. 455, 458, 459, affirmed by 2 Cir., 232 F. 475; cf. Wedge v. Waynesboro Nurseries, Inc., D.C.W.D.Va., 31 F.Supp. 638, 642–643; see United States v. National Lead Co., 332 U.S. 319, 349–350, footnote 8, 67 S.Ct. 1634, 91 L.Ed. 2077.

14. United States Frumentum Co. v. Lauhoff, 6 Cir., 216 F. 610, 625.

15. Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 6 Cir., 95 F.2d 978, 984, appeal dismissed 306 U.S. 665, 59 S.Ct. 459, 83 L.Ed. 1061; Rockwood v. General Fire Extinguisher Co., 2 Cir., 37 F.2d 62, 66, certiorari denied 269 U.S. 571, 46 S.Ct. 26, 70 L.Ed. 417; see also Horvath v. McCord Radiator & Mfg. Co., supra note 13, 100 F.2d at page 335; Reynolds Spring Co. v. L. A. Young Industries, 6 Cir., 101 F.2d 257, 261; Dunkley Co. v. Central California Canneries, supra note 9, 7 F.2d at page 976.

16. Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., supra note 15, 95 F.2d at page 984.

17. Hunt Bros. Fruit-Packing Co. v. Cassiday, supra note 8, 64 F. at page 587; Malleable Iron Range Co. v. Lee, supra note 13, 263 F. at page 898; Austin-Western Road Machinery Co. v. Disc G. & P. Co., supra note 13, 291 F. at page 304.

18. Horvath v. McCord Radiator & Mfg. Co., supra note 13, 100 F.2d at page 336; Reynolds Spring Co. v. L. A. Young Industries, supra note 15, 101 F.2d at page 261.

19. Dunkley Co. v. Central California Canneries, supra note 9, 7 F.2d at page 977; Activated Sludge v. Sanitary Dist. of Chicago, D.C.N.D.Ill., E.D., 64 F.Supp. 25, 36, affirmed per curiam by 7th Cir., 157

certainty of the computation."[20] The gross receipts and profits of the infringer are considered,[21] along with royalties paid in more or less similar circumstances, [22] although the weight of such evidence in any particular case might be slight.

This case presents many and peculiar difficulties. The written license agreements in the record, for the reasons pointed out above, are not of great help.[23] It is true, taking the figures from appellant's own analysis of the agreements, that the highest annual per-unit royalty to be found among them is $42.40, while the trial court's finding of a $3000 reasonable annual royalty for appellant's operation fixes the per-unit royalty for that operation at about $95. But we also find that the agreement specifying a per-unit royalty of $42.50 involved a location with an operating season of only five or six months. Of the 10 written agreements, it appears that only the Loof agreement involved a location permitting operation for longer than six months a year. We cannot agree with appellant's contention that the number of playing units licensed was the sole factor determining the amount of the royalties. The annual per-unit royalties in these agreements varied from $20 for a two or three months operation to more than $40 for a five or six months operation. In light of the fact that appellant's operating season was 12 months and in view of the uncertainties clouding any attempt to use these agreements to determine a reasonable royalty, it cannot be said that the agreements show the trial court's findings to be clearly erroneous.

The difficulties posed by the variation in the operating seasons of the locations for which licenses were granted is avoided if the Loof agreement is used as a basis for determining a reasonable per-unit royalty.

This agreement by itself, however, cannot be taken as a standard to measure the value of the patent. The agreement was a compromise to avoid mutually hazardous and expensive litigation.[24] And we cannot discount the pecuniary value to appellee of the undertaking of the licensees in that agreement to provide more than half the expenses of this suit against appellant. We can agree with the appellant that the court below gave undue weight to the literal terms of the agreement in its findings. But the agreement's stated total royalty cannot be tortured into a fair and reasonable annual rate for the entire period of use of the patented game by the licensees, in light of the atmosphere of compromise in which it was executed and the substantial obligation assumed by the licensees to prosecute an expensive lawsuit. The most that can be said for the Loof agreement is that it fails to support either the findings of the court or the contentions of appellant and is of little value in determining damages in the cause.

Appellee testified in a deposition that, in addition to the written license agreements discussed, he had granted four oral licenses. Two of these provided for annual royalties of $3000, one authorizing operation of 52 playing units at a location in Ocean Park, California and the other permitting use of 70 units in Atlantic City, New Jersey. The other two licenses were for operations at small amusement parks in New Jersey which permitted only 100-day annual operations, and these provided for annual royalties of $1000.

From appellee's deposition and the written license agreements in the record, it appears that the appellee attempted to keep a close monopoly of the supply of the patented game apparatus during nearly the whole of the term of the patent. Though the de-

F.2d 517, certiorari denied 330 U.S. 834, 67 S.Ct. 970, 9 L.Ed. 1281; Consolidated Rubber Tire Co. v. Diamond Rubber Co. of New York, supra note 13, 226 F. at page 459.

20. Consolidated Rubber Tire Co. v. Diamond Rubber Co. of New York, supra note 13, 226 F. at pages 462–463.

21. See Autographic Register Co. v. Sturgis Register Co., 6 Cir., 110 F.2d 883, 886.

22. Austin-Western Road Machinery Co. v. Disc G. & P. Co., supra note 13, 291 F. at pages 304–305.

23. See Dunkley Co. v. Central California Caneries, supra note 9, 7 F.2d at page 976.

24. See Dunkley Co. v. Central California Canneries, supra note 9. 7 F.2d at page 976.

tails of appellee's activities in this regard are not altogether clear from the record, the appellee testified without contradiction that he realized an average net profit of approximately $150 on each unit of playing apparatus which he furnished to his licensees under his licensing agreements. The machines were furnished on so-called lease agreements, whereby title was to remain in the appellee until the expiration of the patent. In certain instances where persons had obtained machines elsewhere and conducted infringing operations, appellee required that the machines be transferred to him by bill of sale as a condition of granting a license. Not until the Loof agreement in 1946 does it appear that the appellee gave consent to the procurement of machines from a source other than himself.

Since the profit to appellee on the furnishing of the machines was a part of the consideration exacted for a license, and a part of the value to appellee of the patent, it could properly be considered a part of the fair value of what was taken by appellant's infringement.

Appellee has been in the business of licensing his patented game device for about 20 years. He also personally operated the same game device in 1931 at a location adjoining that where appellant later conducted his infringing operation. On numerous occasions appellee visited appellant's establishment and observed the operations there.

On the basis of his experience and observations of appellant's enterprise, appellee estimated that the appellant realized a net profit of $36,000 a year from the operation. Considering the price charged by appellant and the speed of operation of the games, appellant's operation had a capacity for a gross income of several hundred thousand dollars a year. While the testimony in regard to the earnings of appellant's enterprise was largely conjectural, it was the only evidence offered on this question. Appellee estimated that a fair annual royalty for a license at appellant's location was $10,000.

The lower court's award of damages was based upon an infringing period of five years, while the appellant in fact infringed for more than four months longer. than that. Further, the lower court awarded no damages based upon appellee's customary profit on supplying the game apparatus.

On the whole record we cannot say that the lower court's award of damages was excessive. Appellant urges that where, as here, a cause is tried wholly on exhibits and depositions, this court is in as good a position as the trial court to determine the facts and may draw its own inferences from the record.[25] Even so, in the last analysis the problem simply boils down to whether or not the findings can be said to be "clearly erroneous" when measured against all of the evidence.[26] We have examined the evidence in this case and it does not definitely and firmly convince us that "a mistake has been committed."[27]

▮▮▮ Appellant contends that there is no basis for the lower court's award of additional attorneys' fees under that portion of 35 U.S.C.A. § 70.[28] which pertains to the power of courts to award attorneys' fees in patent cases. In Park-in Theatres v. Perkins, 9 Cir., 190 F.2d 137, 142, this court, construing that provision, held that " * * * the payment of attorney's fees for the victor is not to be regarded as a penalty for failure to win a patent infringement suit. The exercise of discretion in favor of such an allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or

25. Equitable Life Assurance Society of the United States v. Irelan, 9 Cir., 123 F.2d 462, 464; Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 178 F.2d 541, 548; Rollingwood Corporation v. Commissioner of Internal Revenue, 9 Cir., 190 F.2d 263, 265; Stuart Oxygen Co., Ltd., v. Josephian, 9 Cir., 162 F.2d 857, 859.

26. Fed.Rules of Civ.Proc. rule 52(a), 28 U.S.C.A.; Rollingwood Corporation v.

Commissioner of Internal Revenue, supra note 25, 190 F.2d at page 265.

27. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.

28. " * * * The court may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment on any patent case. * * * "

some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigants normally bear." [29]

In Dubil v. Rayford Camp & Co., 9 Cir., 184 F.2d 899, 902, 903, this court stated that " * * * the basis on which attorney fees are to be awarded must be stated clearly. Otherwise it becomes the duty of the reviewing court to set the award aside."

Here the basis for the award of attorneys' fees was not stated. The court below found only that legal expenses were incurred by appellee and that "One Thousand ($1000) Dollars should be allowed as additional attorneys' fees, which sum is reasonable and nominal in view of the nature and extent of the litigation." The court made no findings of bad faith or inequitable conduct on the part of appellant or other equitable considerations making it grossly unjust for appellee to bear the burden of his own counsel fees.

The lower court in colloquy with counsel referred indirectly to appellant as a "deliberate infringer," but made no finding to this effect. We find no basis in the record for the conclusion that appellant deliberately infringed prior to the commencement of this action. It is true that after the present suit was instigated appellant made modifications in his game device in an unsuccessful attempt to avoid infringement. However, there is no reason to believe that appellant did not at that time have a good faith doubt as to the validity of appellee's patent. On our original decision, the Supreme Court granted certiorari to dispel doubts whether the judgments of this and the lower court that appellee's patent was valid were in conflict with the case of Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3. Since there was good reason for doubt as to the validity of the patent, we see no reason to penalize appellant's abundance of caution.

Appellee contends that the appellant pursued obstructionist tactics in the conduct of the proceeding to establish damages. We find no support in the record for this contention, unless it be the wholly vague and inconclusive deposition of appellant on the question of his receipts and profits from the infringing operation. But this testimony seems more consistent with honest ignorance and almost total lack of business acumen, reflected in weird ways of handling his finances, than with dishonesty or bad faith.

The judgment is affirmed, except as to the judgment for additional attorneys' fees; the judgment is reversed insofar as it awards additional attorneys' fees of $1000.

---

29. See also Day-Brite Lighting, Inc., v. Ruby Lighting Corp., 9 Cir., 191 F.2d 521.