**HUGHES TOOL COMPANY, a corporation, Plaintiff,**

v.

**SMITH INDUSTRIES INTERNATION-
AL, a corporation, Defendant.**

**Civ. A. No. 2809.**

United States District Court
W. D. Texas,
El Paso Division.

Dec. 21, 1966.

Haight, Simmons & Hofeldt, Chicago, Ill., Shafer, Gilliland, Davis, Bunton & McCollum, Odessa, Tex., and Andrews, Kurth, Campbell & Jones, Houston, Tex., for plaintiff.

Wynne, Jaffe & Tinsley, Richards, Harris & Hubbard, Dallas, Tex., and Stubbeman, McRae, Sealy & Laughlin, Midland, Tex., for defendant.

GUINN, District Judge.

### Findings of Fact

1. This is an action for infringement of United States Patent No. 3,075,781 relating to rotary drill bits for use in drilling for oil and gas and in similar mining operations. The Complaint charges defendant with having infringed the patent by its manufacture, sale and use of rock bits which embody the invention of the patent, and seeks injunctive relief and damages. The usual defenses, denying infringement and challenging the validity and enforceability of the patent, have been pleaded. In addition, these defenses are raised affirmatively by defendant in two counterclaims, the first of which charges that plaintiff has violated Section 2 of the Sherman Act as a result of its attempts to enforce the patent, and the second of which seeks a Declaratory Judgment that

the patent is invalid and not infringed by defendant.

2. The jurisdiction of this Court is predicated upon the fact that this is an action arising under the patent laws of the United States.

3. The plaintiff is Hughes Tool Company, a corporation of the state of Delaware, having its principal place of business in Houston, Texas. It is engaged primarily in the business of manufacturing, leasing and selling rotary drilling equipment including rotary drill bits. Plaintiff is the owner of the entire right, title and interest in and to United States Patent No. 3,075,781.

4. The defendant is Smith Industries International, a corporation of the state of California, having a regular and established place of business within this district. Through one of its divisions, the Smith Oil Tool Company, defendant engages in the manufacture and sale of rotary drill bits.

5. U. S. Patent No. 3,075,781 issued on January 29, 1963 upon the application of Gerald O. Atkinson, William H. Cline, Jr. and Robert A. Cunningham, filed February 10, 1958. The patent issued to plaintiff, Hughes Tool Company, upon the assignment of the inventors.

6. The subject matter of the patent in suit is a bearing seal appropriate for use in a rotary drill bit. The function of the seal is to retain lubricant in the bearings of the bit and to prevent contamination of the lubricant due to the entrance of drilling fluid and cuttings from outside of the bit during the drilling operation. Seal bearing bits embodying the invention of the patent have a longer average drilling life than similar conventional non-sealed bits, and are therefore more economical.

7. In rotary drilling, a drill bit is placed upon the lower end of a drill pipe or stem. The pipe is lowered into the hole and rotated during the drilling operation. A drilling fluid, usually a thin mud, is pumped down through the center of the pipe to emerge at the drill bit where it picks up cuttings loosened at the bottom of the hole. The cuttings are carried off by the drilling fluid to the outside of the drill pipe and upward through the well bore to the surface.

8. The equipment used in rotary drilling is extensive as well as expensive. A rotary drill rig includes equipment to support and rotate the drill pipe, mechanism for raising and lowering the entire stem and for stacking sections of the pipe during the raising and lowering operation, pumps which circulate the mud, and the power for all such operations. In order to maintain such rigs in continuous operation, three crews of four or five men each and a supervisor are usually employed. The investment in this equipment, and the expense of the crew, result in costs of from $50.00 or more per hour, quite apart from the cost of the drill bits and regardless of whether the bit is drilling effectively, or not at all.

9. When the life of a rock bit has expired, the drilling crew must raise the drill stem, uncouple and stack the sections of pipe, substitute a new bit, and then recouple and lower the pipe into the hole in order to resume drilling. In deep drilling, the mere changing of the bit will consume 8 to 10 or more hours. In addition, such changes result in (1) wear to equipment used in raising and lowering the drill pipe, necessitating further time and expense to repair or replace this equipment and (2) a decrease in the efficiency of the crew due to the lessening of time available for the performance of other tasks.

10. For the reasons set forth in the foregoing findings, it is important that a rock bit shall drill as rapidly as possible. It is even more important that such bits have a long drilling life. The life of a bit becomes increasingly more critical in deep drilling where the well bore frequently reaches depths of two or three miles or more, and the time and attendant cost of replacing a bit are considerably higher.

11. The rotary bits here involved are of the type having a roller cone construction. They include a head, which

can be threaded onto the lower end of the drill stem, and three generally conical-shaped cutters mounted on bearings at the lower end of the head. The head has three leg sections each of which contains a grease reservoir designed to provide a constant supply of lubricant to the bearings on which the cutters turn. As the drill stem is rotated during the drilling operation, the cutters are caused to roll upon the bottom of the hole with great force, and thus disintegrate the rock formation.

12. The effective life of such a rock bit is limited by two factors: first, the deterioration of the cutting surfaces of the conical cutters as the bit acts upon the bottom and sides of the hole, and secondly, by wear of the cutter bearings and bearing surfaces which, if allowed to progress, will cause the conical cutters to either become frozen on the head section or to fall off of the head.

13. The invention of Atkinson patent is directed to the broad problem of bearing wear. The problem of bearing wear has been recognized since the introduction of the first roller cone bit in 1909, and is referred to in early patents Nos. 930,759 and 1,010,144 relating to such bits. It was realized that a constant supply of oil or grease to the bearings would increase their effectiveness and their life. But it was also noted that if drilling fluid or mud was allowed to enter the bearings, the grease or oil became contaminated. When this occurs, not only is the effectiveness of the lubricant reduced, but bearing wear is often promoted at a faster rate than if no grease or oil is provided at all.

14. As early as 1918, attempts were made to design a roller cone bit in which the bearings would be sealed off from the outside environment of the bit. Two such arrangements are shown in patent Nos. 1,283,193 and 1,305,488. Various other types of packing rings and sealing gaskets were subsequently suggested to retain the grease in the bearings and to exclude foreign matter from the bearing area.

15. When such efforts failed to solve the problem, the industry turned to other means in its search for longer bearing life. In the 1920's, for example, it was not uncommon for rock bits to be equipped with large and complex lubricator sub-assemblies which, when threaded on to the top of the bit, extended many feet up into the drill stem. These lubricators contained a large supply of grease which was fed downward and into the bit through a system of passageways and finally to the bearing area. Since the bearings were not sealed, the grease leaked out at the bottom of the bit. So long as the supply of grease held out, and grease continued to flow through the bit, the bearings were lubricated and drilling fluid was kept out. When the supply of grease was exhausted, the entire drill string was lifted from the hole, and the grease replenished.

16. Later, with improvements in the bearings themselves, the costly and inefficient lubricator sub-assemblies were discarded. Attempts to provide a constant supply of grease to the bearings, or to seal the bearings from the drilling fluid, were abandoned. Instead, it became common to provide for lubrication merely by the incidental circulation of the drilling fluid or mud through the bearings. This was commonly known as "slush lubrication."

17. Throughout this period, however, those working in the art of rock bit design continued to be conscious of both the need for an effective bearing seal and of the advantages which would be realized if one could be designed. Attempts were made, both by Hughes Tool and by other bit manufacturers, to develop such a seal. Seal manufacturers were also consulted. No apparent solution to the problem was reached.

18. In order to overcome the problems met by previous research work, it was necessary to provide a seal which could be accommodated in the very limited space available in a rock bit, and yet be of such a character as to withstand the extreme weights, temperatures and

rapid movements peculiar to the operation of such bits. As is recognized in the patent (Col. 2, line 72 et seq.):

"Earth boring bits are subjected to extreme stresses. For example, it is not uncommon that a static load, or weight, of 40,000 pounds to 70,000 pounds be applied to a three cone bit 8¾" in diameter. Resulting stresses are augmented by impact stresses of high amplitude as bits often run 'rough' especially when drilling hard formations. Such extreme conditions cause a complex movement of the cutter 7 relative to the shaft 4, and such movement is amplified as wear takes place. One component of movement is axially of the shaft. At the same time, there is a wobbling movement of the cutter relative to the shaft. Hence, the seal ring 21 must be so constructed and arranged that it will follow every movement of the confronting surfaces of the bit head and the cutter."

19. An effective seal must not only possess the resiliency to follow the erratic movements and high loading of the cutters, but also have the capability of maintaining an effective seal against rapid and extreme changes in the relative pressures of the grease and drilling fluid. Thus, in deep drilling the weight of the column of drilling fluid in the hole will develop a hydrostatic pressure of as much as several thousand pounds per square inch at the bottom where the bit is operating. This pressure varies with the depth of the hole and the weight of the fluid or mud. The grease in the rock bit is maintained under a similar pressure by the use of a diaphragm arrangement between the drilling fluid and the grease reservoir. Because of the erratic, wobbling movement of the cutters on the bit, however, the volume which the grease occupies at the bearing area is constantly and rapidly changing. It can be seen, therefore, that as the cutter moves on the shaft of the bit, there will be a "pumping" action on the grease as the volume is decreased and a suction effect as the volume increases. In order to effectively retain

the lubricant within the bearing and prevent the entrance of the drilling fluid, the seal must continue to function during these rapidly alternating changes in relative pressure.

20. The invention of the patent in suit came as the result of work by three employees of Hughes Tool Company, Gerald Atkinson, Harrison Cline and Robert Cunningham. Instead of utilizing conventional seals designed for general, heavy duty purposes, these men conceived of a structure which is both capable of working under the peculiar conditions encountered in rotary drilling and yet meets the very restrictive space limitations of a rock bit.

21. The preferred form of the Atkinson seal is illustrated and described in the patent. The inner spring or core of the seal is constructed of steel or other resilient material. It is somewhat dished in its shape and takes the form of a frustrum of a cone. Such a spring (often referred to as a "Belleville" type spring) is capable of deforming or flattening under the type of axial loading encountered in a rock bit, and of returning to its original dished shape when the loading is decreased or ended. The entire spring is encased in an oil resistant synthetic rubber. The rubber is contoured along the inner diameter of the seal, as well as on the opposing face of the outer diameter, to form circular beads or sealing pressure pads. The pads press against the opposing annular surfaces of the bit head and the conical cutter as the latter is rotated so as to achieve a sealing at each area.

22. The seal is mounted on and around the shaft of the bit leg during assembly of the bit so that the pressure pad at its inner diameter bears against the sealing surface of the head. A conical cutter, when positioned over the shaft and forced upon the seal, partially flattens or places the seal under tension. In this position, the pressure pad at the outer diameter is pressed against the sealing surface of the conical cutter. The resiliency of the spring in the seal provides for continuous pressure of the

pads on both sealing surfaces throughout compound movements of the conical cutters during operation of the bit.

23. In order to accomplish sealing throughout extended periods, and during extreme wobbling movements of the cutters, the seal is mounted on the shaft of the bit with a slight clearance between the shaft and the inner diameter of the metal spring. Because of the resiliency of the rubber material at the inner diameter, the seal is allowed to move slightly in any direction radial to the shaft. This action, termed "radial floating" in the patent, prevents the seal from being bound to the shaft or crimped during operation of the bit. The seal is also permitted to rotate slightly with respect to the shaft in order to expose various portions thereof to the drilling fluid at the point of maximum wear. Thus, the patent specifies that each of the pressure pad surfaces shall be in "sliding and sealing engagement" with the respective surfaces of the conical cutter and bit leg.

24. Hughes Tool Company tested its new sealed bearing bits in the field in 1958 and 1959 and began regular commercial deliveries in January of 1960. Bits embodying the invention of the Atkinson et al. patent have been extremely successful in alleviating the problem of bearing wear. The effective life of these bits has been materially increased over that of prior, conventional non-sealed bits.

25. Prior to the invention of Atkinson et al., there had been a longstanding need in the well drilling industry for a lubricant seal which would work effectively to retain lubricant in the bearings of a rotary drill bit during its operation, and prevent the entrance of drilling fluid, mud and cuttings. The invention of the Atkinson et al. patent has satisfied this need, and has enjoyed substantial commercial success.

26. The invention of the Atkinson et al. patent represents a meritorious contribution to the art of rotary drilling, and the patents are entitled to a liberal construction which will tend to preserve,

rather than destroy, the reward for the contribution.

27. The invention of the Atkinson et al. patent is a novel advance in the art of rotary drilling. Defendant has cited over 75 domestic and foreign patents which it urges anticipate or render obvious the invention of the patent. A somewhat lesser number of these prior patents were discussed during the trial. None of these patents discloses the structure claimed as invention by the patent; nor has it been shown that any of the prior devices were suitable, or actually used, to accomplish the rock bit sealing function which the present invention performs. Further, it has not been shown that any of the structures disclosed by the prior art have had any substantial commercial use; none provided or taught a solution to the problem which workers in the rock bit industry had been attempting to solve for many years.

28. The prior art most emphasized by defendant is the patent to Curtis, No. 2,560,557. During the trial, both defendant and plaintiff produced model seals which were said to represent the structure shown in the Curtis patent, and commented on tests performed on the respective metal cores of such models.

29. The models produced by defendant departed substantially from the seal shown in the Curtis patent. In place of the "spaced yielding fingers" shown and described by Curtis, defendant substituted, in one of its models, a plain Belleville type spring, and in the other model, a slotted Belleville spring. These springs were formed at a lesser angle or height than that of the fingers in Curtis. Instead of the rigid continuous ring-shaped flanges which in Curtis' patent are employed to resist any action tending to deform the seal out of its circular shape, defendant merely turned the edges of its Belleville spring at the inside and outside diameters. Finally, defendant changed the proportion of each dimension of the seal disclosed in the Curtis patent so as to materially change its overall shape, and employed a thinner gauge of steel than that sug-

gested by the illustration of the Curtis seal, or used in defendant's commercial seal. In its tests of the metal core of its model, defendant found that core had a load deflection curve similar to that of the Belleville spring used in the accused rock bit seals but that its fatigue life was substantially less.

30. The model Curtis seal produced by plaintiff is a faithful reproduction of the seal illustrated in the Curtis patent. It is dimensionally in scale with the drawings and employs the same gauge of steel in the inner core. In its tests of this metal core, plaintiff demonstrated that the rigid continuous rings acted to prevent the seal of the Curtis patent from being elastically flattenable. A loading of up to fourteen hundred pounds failed to deflect the model Curtis core to any appreciable extent. When a thinner gauge of metal was substituted in an otherwise identical model, a loading sufficient to produce deflection caused the seal to buckle and take on a permanent set.

31. The Court accepts plaintiff's evidence as to the nature of the Curtis seal. The numerous modifications which defendant proposes be made to such seal are neither shown nor suggested in the Curtis patent. The result of these modifications is a hybrid seal far more similar to the Atkinson patent than to the Curtis seal from which defendant urges it is derived. The Court does not find this evidence to be persuasive. As an *ex post facto* attempt to re-invent the Curtis seal in the light of Atkinson's teaching, it is little more than a recognition of Atkinson's success in solving the problem.

32. This view of the evidence is supported by the Curtis patent itself. The sealing device there described does not appear to have been intended for use in a rock bit. As shown in the Curtis patent, it does not meet the restrictive space limitations of such a bit. Further, Curtis' seal does not have, or claim to have, the flattenability and elasticity capabilities which Atkinson teaches, and which are necessary under the conditions peculiar to the operation of a rock bit as described in the above findings. As in the case of the other prior art patents, the Curtis patent did not teach those attempting to develop a rock bit seal how to accomplish it.

33. The invention of Patent No. 3,075,781 would not have been obvious to one having ordinary skill in the art of rock bits at the time the invention of the patent was made. The statutory presumption that the patent is valid is supported by the well drilling industry's acceptance of bits embodying the invention, by the long recognized need which they have satisfied, and by the repeated failures of others working on the problem to solve it. The imitation of such sealed bits by defendant after they had been brought on the market by plaintiff is indicative of the merit which defendant itself ascribes to the invention, and is persuasive that the Atkinson et al. patent discloses a valuable contribution to commerce and is valid.

34. After Hughes Tool Company had begun testing its sealed bearing bits in the field, other rock bit manufacturers undertook specific research programs in order to similarly develop a seal. The Smith Oil Tool Division of defendant began its program in 1958. Security Engineering Division of Dresser Industries started in 1959. Both rock bit engineers and specialists in the design and manufacture of seals worked on the problem. Various types of seals were suggested and tested. None of these had any apparent success. None were adopted for commercial use.

35. Defendant's attempts to develop a seal continued through 1959. During this period, defendant was conscious of the testing being carried on by Hughes Tool, but was unable to learn the exact structure of its seal. Then, in January of 1960, Hughes Tool introduced its new sealed bearing bits to the market, and the first commercial deliveries were made. Within a short time, one of defendant's field personnel was able to obtain a piece of a seal from a used Hughes bit which had run in an actual well drill-

ing operation. The piece was forwarded to Smith's development engineers where it was photographed and analyzed. Within a few months, Smith had completed its copy of the Hughes development, and was field testing the seals in its own bits. The accused bits of defendant, which were commercially introduced in 1961, employ a seal which is virtually identical to the Hughes patented seal.

36. Defendant's initial copy of the Hughes patented seal was designated as type "F". Subsequently, types "F–1" and "F–2" were made. The "F–2" seals were brought onto the market in commercial sealed bearing bits in 1961 and are still being sold by defendant. Each of the "F", "F–1" and "F–2" seals employ a corrugated steel core which in its relaxed position is an elastically flattenable frusto-conical (Belleville) spring; in each type the spring is encased in synthetic rubber and has sealing pads on their opposing faces. The seals themselves are virtually identical, but in the case of the "F–2", the opposed annular sealing surfaces on the bit leg and conical cutter are slightly canted and the shaft upon which the seal is mounted is tapered.

37. In 1965 defendant began making its so-called "L–1" seal and this modified seal came into limited commercial use in 1966. Like the "F–2", the "L–1" employs an elastically flattenable steel core encased in synthetic rubber with opposing sealing pads. Instead of corrugations, however, the steel core is comprised of two plain frusto-conical (Belleville) springs which are nested together. Canted sealing surfaces are provided on the bit leg and conical cutter. The shaft, instead of being tapered, is cylindrical as in the case of the earlier "F" and "F–1" types.

38. During the trial, defendant attempted to refute evidence presented by the plaintiff to the effect that the commercial "F–2" and "L–1" type seals will rotate with respect to the shaft during operation of the bit. This issue is critical on the question of infringement. Defendant bases its denial of infringement upon the contention that its seals do not meet claim language in the Atkinson et al. patent which specifies that the seal shall be "radially floatingly surrounding said shaft" and "in sliding and sealing engagement" with each of the annular sealing surfaces.

39. The Court finds, on the preponderance of the evidence, that the commercial seals of defendant rotate with respect to the shaft during operation, and that such seals constitute an infringement of the Atkinson et al. patent. Robert A. Cunningham, one of the inventors of the patented seal, testified that he had examined many used seals after they had been run in actual bit operation and that it could be determined, after a study of the wear and tear marks on such a seal, whether the seal had remained stationary on the shaft or had rotated. Mr. Cunningham testified that, on the basis of his experience with the patented Hughes seals and of his examination and study of the accused Smith seals, the accused seals would rotate during operation of the bit. Mr. Cunningham's opinion was supported and confirmed by his examination, in the court room, of used Smith seals produced by the defendant in which he found wear and wear marks from which it could be determined that such used seals had rotated during their life in the bit.

40. Defendant offered the opinions of its vice-president and an expert witness that the Smith seals do not rotate during the operation of the bit at the bottom of the hole. These opinions were not persuasive. The vice-president, Mr. William Neilson, based his opinion upon an examination of individual Smith bit leg assemblies prior to the time that grease was added to the bearings. His observation that the seal did not rotate on the shaft because of the dry friction involved, is of little value in determining whether the seal will turn at the bottom of the hole in the presence of grease from the bearings and drilling fluid from the well bore. The expert

witness, Dr. John V. Pennington, based his opinion solely upon observations of seals on the shaft of a Smith bit prior to final assembly and lubrication. Neither of these witnesses testified as to any examination of worn seals for evidence of rotation during use, and neither attempted to refute Mr. Cunningham's testimony that used seals from both the Hughes and Smith bits had rotated.

41. Finally, defendant's witnesses testified that, in their opinion, rotation of the seals would be prevented by the degree of engagement of the rubber bead at the inner diameter of the seal with the shaft (sometimes termed an "interference fit"), as well as by the canted and tapered features of the sealing surfaces on the bit leg and conical cutter. These opinions are refuted by the facts (1) that the Hughes patented seal has a greater degree of engagement with the shaft than do the accused Smith seals and yet is shown to rotate during use, and (2) the seals in both of the actual production bits of Hughes and Smith in evidence at the trial did in fact rotate as the conical cutters were turned—as observed during the cross-examination of Mr. Neilson and Dr. Pennington.

42. The Court finds, on the basis of the evidence recited above, that the seals employed in the accused seal bearing bits of defendant have the same structure as that described or claimed in the Atkinson et al. patent, and are mounted in the bits so as to be radially floating and in sliding and sealing engagement with each of the annular sealing surfaces of the bit leg and conical cutter. They perform the same function, in the same way and accomplish the same result as the seal of the Atkinson et al. patent. Such seals fall within the language and scope of one or more claims of the patent, appropriate the invention as defined in the claims, and are an infringement of the patent.

43. Gerald O. Atkinson, William H. Cline, Jr. and Robert A. Cunningham are joint inventors of the invention described and claimed in U. S. Patent No. 3,075,781.

44. After the Atkinson et al. patent in suit had been allowed by the Patent Office, but before formal issuance thereof, the inventors sought to amend the patent to obtain additional claims covering a different embodiment of their invention wherein the seal was fixed to the shaft in a non-rotatable relationship. When the amendment was denied, for procedural reasons, the inventors filed a separate application for a patent on this feature and, as a result, U. S. Patent No. 3,199,878 was issued. The aforesaid amendment and subsequent patent were prompted by the manufacture and use by Hughes in 1962 of a small number of sealed bearing bits in which the seals were fixed to the shaft by an adhesive cement, and in which rotation of the seal was prevented. Although this type of arrangement was thought to have utility in certain drilling applications, it has not been incorporated in Hughes' primary commercial bits. Plaintiff has advised defendant that it does not and will not charge infringement of the subsequent patent No. 3,199,878.

45. There is no evidence showing that plaintiff or the inventors committed any fraud in the procurement of the Atkinson et al. patent; that the Patent Office Examiner was misled by plaintiff or the inventors and would not otherwise have granted the patent; or that plaintiff has unlawfully asserted or attempted to extend his rights under such patent. Plaintiff has not misused the patent in suit and is not guilty of unclean hands with respect thereto.

46. Plaintiff has sustained irreparable injury by reason of defendant's infringement of the Atkinson et al. patent and will continue to sustain such injury unless defendant is enjoined by this Court.

### Conclusions of Law

1. This Court has jurisdiction of the subject matter in suit and over the parties hereto.

2. Plaintiff, Hughes Tool Company, is the owner of United States Patent No.

3,075,781 and has the right to maintain suits for infringement of such patent and to recover the proceeds therefrom. Gerald O. Atkinson, William H. Cline, Jr., and Robert A. Cunningham are properly named as joint inventors in such patent.

 3. Under Title 35, U.S.C., Section 282, the patent in suit is presumed to be valid, and the burden of establishing invalidity rests upon the defendant.

 4. The prior art offered in evidence by defendant does not anticipate any of the claims of the patent in suit.

5. Each of the claims of the patent in suit sets forth a structure which involves invention over the prior art.

6. Where there had been a long-recognized need for the solution to overcome defects in the prior art, and where others working in the field had sought for many years to satisfy this need, the solution to the problem as finally solved by the patentees of the patent in suit was a meritorious contribution and not one obvious to those skilled in the art.

7. The copying by defendant of plaintiff's bearing seal is evidence of the invention involved in the patent in suit, since it indicates a recognition by defendant of the importance and value of such seals.

8. The commercial success of the patented seals and rock bits, when compared with seals of the prior art which were attempting to do the same job, is indicative of invention.

9. United States Patent No. 3,075,-781 is good and valid in law.

10. Defendant, by its manufacture and sale of rotary drill bits which employ bearing seals, has infringed United States Patent No. 3,075,781.

11. Plaintiff has not misused United States Patent No. 3,075,781 and is not barred from enforcing such patent.

12. Plaintiff is entitled to an injunction against further infringement of United States Patent No. 3,075,781; to an accounting of its damages sustained by reason of such infringement not less than a reasonable royalty; to a judgment on the damages so determined and execution on such judgment; and to an award of costs.